IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:15-cv-481

**RONALD KOPPERT,**

        Plaintiff,

v.

**THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,**

        Defendant.

_____

## COMPLAINT

Plaintiff, Ronald Koppert, for his Complaint, states and alleges as follows:

## JURISDICTION AND VENUE

1.     This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and principles of federal common law developed thereunder.

2.     This Court has jurisdiction of this action pursuant to 29 U.S.C. § 1132(e)(1), ERISA § 502(e)(1).

3.     Venue is proper in this district under 29 U.S.C. § 1132(e)(2), ERISA § 502(e)(2), because the plan at issue in this litigation was administered in this district.

## PARTIES

4.     Plaintiff Ronald Koppert ("Koppert" or "Plaintiff") is a 62-year-old man who currently resides in Vancouver, Washington and formerly resided in Minnesota on

March 29, 2013—the date of his disability.  On the date of disability, Koppert was 60 years of age.  Koppert was insured through a group long-term disability policy, Policy No. G-44346-NC, effective January 1, 2009, with The Prudential Insurance Company of America ("Prudential" or "Defendant"), sponsored by his employer, Lenovo (USA) Inc. ("Lenovo"). The group long-term disability plan is an employer-sponsored welfare benefits plan within the context of, and governed by, ERISA.

5.      Prudential is headquartered in Newark, New Jersey and is licensed to do and does business in the State of North Carolina. Prudential is the insurer and claims administrator of Lenovo's long-term disability plan ("LTD Plan").

## FACTUAL ALLEGATIONS

6.      Koppert began his employment with Lenovo on or about October 1, 2010. He served as an Enterprise/Field Account Executive in charge of growing Lenovo's business with corporate customers in the upper Midwest. As an employee, Koppert became eligible for, and did participate in, the LTD Plan (Policy No. G-44346-NC).  He became eligible for long-term disability coverage under his employer's group policy on October 25, 2010.

7.      At all relevant times, Defendant was the insurer and claims administrator of the LTD Plan.

8.      The LTD Plan applies to all full-time, non-executive employees of Lenovo.

## LTD Plan Features

9.      Lenovo employees are given the choice to elect long-term disability coverage under two options: 50% wage replacement with no premium contribution from

2

the employee or 66 2/3% wage replacement with a regular premium contribution from the employee.

10.     Koppert elected coverage under the second option: 66 2/3% wage replacement with a regular premium contribution.

11.     Under the LTD Plan, an insured is considered to be disabled when Prudential determines that: "you are unable to perform the *material and substantial duties* of your *regular occupation* due to your *sickness* or *injury*; and you are under the *regular care* of a doctor unless you have reached the maximum point of recovery; and you have a 20% or more loss in your *monthly earnings* due to that sickness or injury." After 12 months of payments, an insured is considered to be disabled when Prudential determines that "due to the same sickness or injury, you are unable to perform the duties of any *gainful occupation* for which you are reasonably fitted by education, training or experience."

12.     Under the LTD Plan, "material and substantial duties" means duties that "are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified."

13.     Under the LTD Plan, "regular occupation" means "the occupation you are routinely performing when your disability begins."

14.     Under the LTD Plan, "gainful occupation" means "an occupation, including self-employment, that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds 60% of your *indexed monthly earnings*, if you are working, or 50% of your monthly earnings, if you are not working."

15.     Under the LTD Plan, the elimination period "is the longer of 26 weeks and the length of time for which [the employee] receive[s] loss of time benefits, salary continuation or accumulated sick leave." The elimination period means the period of continuous disability that must be satisfied before an insured is eligible to receive benefits.

16.     Under the LTD Plan, to determine monthly payment, Prudential multiplies monthly earnings by 66 2/3% and then considers the maximum monthly benefit of $15,000.00. The lesser of these two amounts is the gross disability payment. Prudential subtracts from the gross disability payment any deductible sources of income and disability earnings.

17.     Koppert was a sales professional on the date of disability—March 29, 2013. Under the LTD Plan, monthly earnings are determined by considering the gross monthly income payable from the employer in effect just prior to the date of disability; commissions, bonuses, and overtime pay are not included in the monthly earnings calculation. Koppert's benefit is offset by Social Security Disability.

18.     Under the LTD Plan, the maximum period of benefits for individuals under age 60 on the date of disability is to age 65. For individuals age 60 or over, the maximum period of benefits is 5 years.

19.     Koppert's entire career has been in the computer wholesale industry. He does not have formal post-secondary education.

20.     Koppert joined Lenovo in October 2010 in a sales position and was assigned to the upper Midwest region. His position required frequent travel to present

and demonstrate new products to Lenovo's current and prospective customers—who were large corporate clients. Lenovo estimated that Koppert's position required 40% travel. Koppert also traveled with a 45-pound pack of supplies, which he was responsible to lift, carry, and transport.

## Medical History

21.     In or about 1974, Koppert injured his back in a work-related accident. Koppert was employed by Boeing Co. when he suffered an injury that required two weeks of hospitalization and one month of physical therapy and pain-management treatment. Koppert did not return to Boeing Co. after the accident; he re-trained and sought new employment. He was injured again in another motor vehicle accident that occurred in 1975. As a result of these injuries, in 1995, Koppert underwent a laminectomy at the right L4-L5 and the bilateral L5-S1.

22.     Koppert was involved in a third motor vehicle accident in February 2009. His vehicle was hit by a bus while sitting at a stop light. The collision re-injured his back. Koppert sought medical treatment, participated in physical therapy, and took medication to alleviate pain. Koppert's final treatment report dated September 9, 2009 explained that Koppert's back had not fully improved and that Koppert was likely to experience some chronic symptoms that would require intermittent treatment.

23.     In or about 2001, Koppert underwent left rotator cuff surgery.

24.     In or about 2001, Koppert treated a right humerus fracture and a right retinal tear.

25.     In or about 2009, Koppert underwent right rotator cuff surgery.

26.     In or about October 2012, Koppert injured his back on the job while lifting cartons from his vehicle. Koppert reported lower back pain that radiated down his left leg. He sought medical care to address the pain.

27.     Koppert sought treatment with Mary Broughton, PA-C, of the North Clinic. Initially, Ms. Broughton prescribed Vicodin to Koppert. He then traveled out of the state, which increased his pain.

28.     On October 17, 2012, Koppert attended a medical appointment with Ms. Broughton. She concluded that Koppert's pain symptoms were consistent with an L5-S1 nerve irritation. She prescribed prednisone and Percocet and recommended low back exercises. Ms. Broughton noted that, if Koppert's pain did not improve, she planned to refer him for physical therapy and an MRI.

29.     On October 24, 2012, Koppert saw Ms. Broughton for a follow-up appointment. She prescribed another course of prednisone and renewed the prescription for Percocet.

30.     On November 11, 2012, Koppert saw Ms. Broughton for a follow-up appointment. She described Koppert as having degenerative disc disease and lumbar stenosis. Ms. Broughton ordered physical therapy. She renewed his prescription for Percocet and decided not to order an MRI until after some upcoming travel.

31.     On November 21, 2012, Koppert saw Ms. Broughton for a follow-up appointment. He reported participating in physical therapy and experiencing some pain relief while taking prednisone. Ms. Broughton noted Koppert's radicular low back pain and indicated that he might have a herniated disc or other type of nerve impingement

6

syndrome. She ordered an MRI to follow Koppert's Thanksgiving vacation, prescribed another course of prednisone, and renewed the prescription for Percocet.

32. On December 12, 2012, Dr. Thomas Peltola, a radiologist with North Memorial Hospital, administered an MRI of Koppert's back. Dr. Peltola noted "[d]isk desiccation and loss of disk height" at L4-L5 and L5-S1. Dr. Peltola concluded that Koppert's degenerative disc changes were most pronounced at L4-L5 and L5-S1 but that no new disc herniation could be seen. Dr. Peltola also noted no severe canal or foraminal narrowing.

33. On December 19, 2012, Koppert received an epidural injection by Dr. Troy Long of Minnesota Radiology Associates, Ltd.

34. On January 3, 2013, Koppert returned to Mary Broughton, PA-C, of the North Clinic. He reported that the epidural injection made no improvement in his pain symptoms and that he was having difficulty sleeping. Ms. Broughton referred Koppert to a neurosurgeon, recommended more intense physical therapy, renewed the prescription for Percocet, and prescribed Gabapentin to be taken in the evening to improve sleep.

35. Mary Broughton, PA-C, also referred Koppert to Dr. David Kraker, a surgeon at Advanced Spine Associates, P.A. in early 2013. Dr. Kraker evaluated Koppert on February 5, 2013. Koppert reported that, until October 2012, he experienced two to three back-pain flares per year that could be treated with rest, ibuprofen, and occasional oral steroids. After October 2012, his low back pain returned and had not resolved. Koppert also reported that physical therapy, oral steroids, and steroid injections were no longer providing lasting relief from pain. Dr. Kraker observed tenderness at the L4-L5,

noted Koppert's limited extension, completed various lumbar x-rays, and reviewed the December 12, 2012 lumbar MRI. Dr. Kraker diagnosed L4-L5 spondylolisthesis with instability and right-sided facet synovitis, L5-S1 foraminal stenosis, and disc degeneration and disc collapse at L5-S1 greater than L4-L5. Dr. Kraker also ordered a lumbar CT scan.

36. Koppert returned to Dr. Kraker on March 12, 2013. Dr. Kraker reviewed a CT scan taken on February 18, 2013. He found severe disc collapse at L5-S1, left greater than right, and gaseous degeneration. He also found right L4-L5 facet arthropathy with gaseous degeneration. Dr. Kraker noted Koppert's decreased functionality. Dr. Kraker recommended laminectomy L4-S1 with posterior and interbody fusion L4-S1.

37. Koppert's medical insurer refused coverage for the recommended surgical procedure. Koppert told Mary Broughton, PA-C, that the insurer required the insured to be symptomatic for one year before authorizing coverage for surgery.

38. On April 12, 2013, Koppert returned to Mary Broughton, PA-C, of the North Clinic. Koppert told Ms. Broughton that he stopped working on April 1, 2013. He reported severe low back and left leg pain despite taking narcotics. Ms. Broughton supported Koppert's efforts to take a short-term disability leave. She prescribed OxyContin for twice daily use and Percocet for breakthrough pain. She also prescribed a Lidoderm patch for Koppert's lower back.

39. On June 27, 2013, Koppert completed his initial examination with Physicians Neck & Back Clinics before beginning physical therapy. Koppert's range of motion was limited by his low back pain. His left supine straight leg raising was

restricted to 20 degrees.  Dr. Caroline Mason recommended physical therapy two times per week.

40.    Koppert visited Ms. Broughton again on August 2, 2013.  He stated that physical therapy was increasing his pain but that he also did not realize how deconditioned his back and abdominal muscles seemed to be.  Koppert expressed optimism that the physical therapy would help.  Both he and Ms. Broughton indicated that Koppert planned to return to work in September or October 2013.

41.    On September 24, 2013, Koppert returned to Mary Broughton, PA-C, of the North Clinic.  Ms. Broughton noted that Koppert had been evaluated by three other doctors for potential surgery, but that further physical therapy was recommended. Koppert reported that his pain had become more localized to his lower back.  He said that he was uncomfortable sitting and has limited ability to do household chores.  Ms. Broughton renewed his prescriptions for OxyContin and oxycodone.

42.    On November 22, 2013, Koppert saw Ms. Broughton for a follow-up appointment.  During the appointment, Koppert and Ms. Broughton discussed his current pain symptoms, his medications to treat the pain, and the duties and demands of his job. Ms. Broughton identified his travel-related duties and the carrying of equipment—of which she previously did not understand the extent—as barriers to his returning to work. Ms. Broughton recommended referral to a pain-management program in the hope that Koppert could obtain adjunctive therapies and receive further review of his medications.

43.    In or about December 2013, Koppert discontinued physical therapy. According to a February 19, 2014 status report from Physicians Neck & Back Clinics,

Koppert completed 22 physical therapy sessions before discontinuing contact with the clinic.

44.     In late 2013, Koppert was also referred to pain-management doctors by Mary Broughton, PA-C.  Ms. Broughton was no longer able to prescribe the medication dosages required to manage Koppert's back and leg pain.

45.     Koppert first obtained medical treatment from Dr. Robert Long with Medical Scanning Consultants, P.A.  On December 19, 2013, Dr. Long evaluated Koppert and renewed his prescriptions for OxyContin and oxycodone.  He instructed Koppert to maintain the current doses.  Dr. Long also recommended that Koppert continue physical therapy.  The doctor planned to review Koppert's pain medications.

46.     Koppert was then referred to Dr. Teresa Gurin, a psychiatrist with the SOAR Clinic.

47.     During his intake with Dr. Gurin on February 26, 2014, Koppert denied alcohol abuse, illicit drug use, and abuse of prescription medications.  He produced a negative breathalyzer result.  His instant urinalysis test was negative for illicit substances and showed positive for opiates.  Koppert disclosed to Dr. Gurin that he does run out of his prescriptions early because he will take additional doses to manage pain.  Koppert also disclosed that he had taken hydrocodone during the previous night due to back pain.  Dr. Gurin raised concerns about opiate dependence, instructed Koppert to discontinue alcohol use, and prescribed new medications as alternatives to opioids.

48.     On March 1, March 5, March 11, March 18, and April 8, 2014, Koppert was present for return appointments with Dr. Gurin.  Koppert continued to disclose his

alcohol consumption and tobacco smoking, and he gave negative breathalyzer results at his appointment. Nonetheless, Dr. Gurin continued to be critical of his alcohol and prescription medication use.

49.     Koppert discontinued treatment with Dr. Gurin. He returned to the regular medical care of Mary Broughton. PA-C, even though his pain-medication dosages would be limited under her supervision.

50.     On April 25, 2014, Koppert returned to Mary Broughton, PA-C, of the North Clinic. He reported feeling "persecuted" by his most recent pain-management doctor. Koppert also explained that his current prescriptions were not helping his low back pain. Ms. Broughton and Koppert agreed that he would attend follow-up appointments every 90 days. Koppert signed a controlled substance agreement and agreed to urine drug screening as needed. Ms. Broughton discontinued Koppert's prescription for OxyContin and prescribed Percocet only with a maximum dose of 6 tablets per day (5-325 mg). Koppert was also instructed to continue his use of Celebrex and Lidoderm patches for pain management. He was also instructed to continue all current medications to treat his other medical conditions.

51.     On April 3, 2014, Koppert contacted Physicians Neck & Back Clinics and asked to re-start his physical therapy. He was permitted to continue his therapy.

52.     On July 23, 2014, Koppert saw Ms. Broughton for a follow-up appointment. Ms. Broughton noted that Koppert continued to be "incapacitated and unable to work." Koppert reported a recent fall at home. He had been sitting for a long time and, when he moved to rise from his seat, his back "went out" and he lost the use of

his left leg. He fell on his left arm and was left with a bruise on his arm and left forearm. Koppert expressed interest in a referral to the Mayo Clinic for evaluation. Ms. Broughton renewed Koppert's prescriptions for Percocet and Gabapentin. She also ordered an MRI and referred Koppert to the Mayo Clinic.

53.     On September 18, 2014, Dr. Caroline Mason of Physicians Neck & Back Clinics reported to Ms. Broughton that Koppert completed 29 physical therapy sessions and that Koppert was discharged from physical therapy. Koppert reported improved strength, but no change in his pain symptoms.

54.     On August 1, 2014, Dr. Richard Belkin of North Memorial Hospital administered an MRI of Koppert's back. Dr. Belkin compared his results with the December 12, 2012 MRI and determined no significant change since the last examination. He observed moderate to severe degenerative changes about the lower lumbar posterior articular facet joints. He also noted an eccentric left-sided posterior bulging of the L5-S1 disc. The bulging disc material abuts the anterior aspect of the left S1 nerve root at the disc level.

55.     Koppert was examined at the Mayo Clinic on October 3, 2014. The Mayo Clinic listed Koppert's status as post decompression. He was diagnosed with chronic pain syndrome, degenerative disc disease, and mild degenerative lumbar scoliosis and degenerative spondylolisthesis. He was also diagnosed with minimal disc bulges at L4-L5 and L5-S1 without definite nerve compression and without definite correlation with symptoms. The Mayo physicians were unable to identify an adequate surgical procedure that would address Koppert's needs. They recommended continued non-operative care

and a referral for additional pain management.

56.     On November 21, 2014, Koppert saw Ms. Broughton for a follow-up appointment.  She confirmed his completion of physical therapy.  Ms. Broughton renewed Koppert's prescription for Percocet.  She noted his compliance with his treatments and stated that she was not concerned about medication abuse or Koppert's occasional use of alcohol or tobacco.

**Claim History**

57.     On or about March 20, 2013, Koppert notified Prudential of his need for a formal leave of absence from work at Lenovo.  He informed Prudential that his last day of work would be March 29, 2013.  Prudential sent a letter to Koppert dated March 20, 2013, explaining Loss of Income benefits and Family and Medical Leave of Absence (FMLA) eligibility.  Prudential's letter also included information about how to apply for benefits.

58.     Koppert applied for a leave of absence.  By letter dated April 11, 2013, Prudential confirmed receipt of Koppert's request but reiterated the need for certain medical information.  Prudential gave Koppert until May 11, 2013 to supply an attending physician statement.

59.     By letter dated April 16, 2013, Prudential approved Koppert's FMLA leave from April 15, 2013 through July 3, 2013.

60.     Koppert also submitted a claim for short-term disability (STD) benefits under Lenovo's group policy.  By letter dated May 20, 2013, Prudential approved STD benefits payable to Koppert from April 1, 2013 through July 31, 2013.  The letter

indicated that Koppert's STD status would run concurrently with his FMLA status.

61.     Prudential extended Koppert's STD benefits through August 25, 2013 by letter dated July 10, 2013.  The same letter explained that Koppert's FMLA leave would expire on August 25, 2013.

62.     On or about August 13, 2013, Prudential sent a letter to Koppert explaining that his STD benefits could be extended through September 29, 2013 so long as he continued to provide medical information that supported his disability status.  Prudential then requested additional information from Koppert to assess his eligibility under the LTD Plan.  Prudential supplied a questionnaire and explained that proof of disability included information regarding medical treatment, job duties, education and training, and daily activities.

63.     Thereafter, Koppert submitted a claim for benefits under the LTD Plan.

64.     Prudential extended Koppert's STD benefits through September 29, 2013 by letter dated August 20, 2013.  The same letter explained that Koppert's FMLA leave would expire on September 29, 2013.

65.     By letter dated August 29, 2013, Prudential confirmed receipt of Koppert's LTD claim but explained the need for additional medical information.  The letter further explained that, if Koppert was determined to be eligible, his LTD benefits would begin effective September 30, 2013.

66.     Prudential approved Koppert's claim under the LTD plan by letter dated September 30, 2013.  Prudential found Koppert to be "currently disabled" from his regular occupation.  Through the letter, Prudential informed Koppert that his LTD status

14

indicated that Koppert's STD status would run concurrently with his FMLA status.

61.     Prudential extended Koppert's STD benefits through August 25, 2013 by letter dated July 10, 2013.  The same letter explained that Koppert's FMLA leave would expire on August 25, 2013.

62.     On or about August 13, 2013, Prudential sent a letter to Koppert explaining that his STD benefits could be extended through September 29, 2013 so long as he continued to provide medical information that supported his disability status.  Prudential then requested additional information from Koppert to assess his eligibility under the LTD Plan.  Prudential supplied a questionnaire and explained that proof of disability included information regarding medical treatment, job duties, education and training, and daily activities.

63.     Thereafter, Koppert submitted a claim for benefits under the LTD Plan.

64.     Prudential extended Koppert's STD benefits through September 29, 2013 by letter dated August 20, 2013.  The same letter explained that Koppert's FMLA leave would expire on September 29, 2013.

65.     By letter dated August 29, 2013, Prudential confirmed receipt of Koppert's LTD claim but explained the need for additional medical information.  The letter further explained that, if Koppert was determined to be eligible, his LTD benefits would begin effective September 30, 2013.

66.     Prudential approved Koppert's claim under the LTD plan by letter dated September 30, 2013.  Prudential found Koppert to be "currently disabled" from his regular occupation.  Through the letter, Prudential informed Koppert that his LTD status

14

Case 5:15-cv-00481-D   Document 1   Filed 09/17/15   Page 14 of 22

would be periodically reviewed and that Koppert would be required to submit additional medical information to prove his disability status.

67.    Less than two months later, on November 20, 2013, Prudential informed Koppert by letter that he was no longer eligible for benefits under the LTD Plan. Prudential closed Koppert's claim and terminated benefits effective November 1, 2013. Prudential relied on Koppert's completion of physical therapy and a report from Mary Broughton, PA-C, to one of Prudential's doctors that Koppert would be well enough to return to sedentary work in mid-September 2013.  Prudential then proceeded to classify Kopper's regular occupation as sedentary.  The letter provided 180 days to appeal the termination of benefits.

68.    By letter dated December 19, 2013, Prudential confirmed receipt of a statement from Mary Broughton, PA-C, in support of Koppert's continued receipt to LTD benefits.  Prudential indicated that it had not commenced its appeal review because it expected to receive additional medical documentation from Koppert.

69.    Prudential took Koppert's first appeal under review on or about February 24, 2014.

70.    Koppert spoke to the Prudential appeals unit on February 27, 2014.  He asked Prudential to consider records from Mary Broughton, PA-C, and Dr. Teresa Gurin. In response, Prudential requested the medical records related to this request.

71.    Koppert contacted Prudential by telephone on April 21, 2014 to alert the appeals unit that he would be submitting physical therapy records.

72.    Koppert faxed another statement from Mary Broughton, PA-C, to

Prudential on or about May 14, 2014. In his cover letter, Koppert reported constant back and left leg pain. He disclosed taking Percocet 6 times per day for pain management. He also confirmed that he continued to participate in physical therapy to strengthen muscles and maintain flexibility.

73. Prudential tolled the appeal pending Koppert's submission of additional medical records.

74. In a letter dated June 12, 2014, Prudential affirmed its termination of benefits and stated that its letter was a denial of Koppert's first request for reconsideration. Prudential indicated that its reviewing physician, Ruth Light, reviewed Koppert's medical records and determined that he was not disabled. Dr. Light concluded that all evidence in support of work restrictions was based on subjective complaints of pain that could not be "clinically verified." Dr. Light then reported: "It is more likely than not that pain behavior observed after November 01, 2013 was related to opioid misuse, drug-seeking behavior, or opioid-induced hyperalgesia." As such, Prudential determined that the claim record lacked proof of medically necessary work restrictions and declined to consider further factors or questions. The letter provided 180 days from receipt to submit a final appeal of the termination of benefits.

75. On or about December 22, 2014, Koppert submitted a timely second appeal of Prudential's termination of benefits.

76. In his December 22, 2014 second appeal, Koppert again argued that he became disabled on March 29, 2013 and did not work beyond this date. He presented objective and subjective evidence of his medical conditions—including degenerative disc

disease—and refuted claims that his back pain resulted from an overuse of opiate medication. Koppert asserted that the claim record supported his eligibility for benefits under Prudential's regular occupation *and* gainful occupation standards.

77. In his December 22, 2014 second appeal, Koppert argued that his medical records confirm he had been disabled since March 29, 2013. Specifically, Koppert highlighted his past CT scans that showed severe disc collapse at L5-S1 and instability at L4-L5. A more recent scan from August 2014 showed similar results, including a small bulge of the L4-L5 disc and the L5-S1 disc. Koppert's treating physicians warned that Koppert needed to avoid aggravating activities. As part of his appeal, Koppert submitted to Prudential assorted medical and prescription records from various time periods, supporting his March 29, 2013 date of disability.

78. In his December 22, 2014 second appeal, Koppert argued that the report of Prudential's reviewer, Dr. Ruth Light, improperly focused on Koppert's use of pain medication and failed to produce any evidence to refute Koppert's claim of disability. Dr. Light discounted Koppert's medical conditions by stating that it was more likely than not that Koppert's pain was related to opioid misuse and less likely caused by increased pain generated by unchanged pathology. She also endorsed rejection of Koppert's subjective reports on the basis of Koppert's alleged narcotic dependence. Koppert highlighted medical records indicating that he consistently disclosed all alcohol and medication use, passed the sobriety testing imposed by his treating physicians, and was always granted medication refills by his doctors following medical appointments. Koppert acknowledged finishing his prescriptions early, but he attributed that use to increased

pain and the need for relief. His medical records support Koppert's claims that his reports of increased pain and the need for more pain management medication were credible.

79.     In his December 22, 2014 second appeal, Koppert submitted a statement from Mary Broughton, PA-C, dated November 7, 2014. Ms. Broughton has provided medical care to Koppert for many years, and she expressed no concern about Koppert's abuse of medications. She also stated that Koppert's reports of pain have been consistent since his October 2012 injury and that she believes his pain is related to severe degenerative joint disease of the lumbar spine. As of the date of the statement, Ms. Broughton concluded that Koppert is disabled from any type of work.

80.     In his December 22, 2014 second appeal, Koppert submitted a personal statement and diary of his sleep patterns. Koppert explained the reason for recreational travel close to the time of his October 2012 injury. He also described when he determined that he could no longer meet his job duties at Lenovo. Finally, he also stated that his past referrals for pain management did not meet his medical needs. One particular provider—Dr. Gurin—tried to impose religious beliefs that made Koppert's treatment unpleasant and frustrating. He chose to modify his medication regimen and return to the regular care of Ms. Broughton. Koppert reported on-going pain that also interrupts his sleep, causing fatigue.

81.     In his December 22, 2014 second appeal, Koppert supplied a Functional Capacity Evaluation (FCE) report. The evaluation was conducted by Park Nicollet Occupational Rehabilitation on October 23, 2014. The FCE report states that Koppert

gave maximum, consistent effort throughout the testing process and demonstrated moderate signs of pain and fatigue during the administration of tests. The FCE report recommended that Koppert be limited to a four to five hour work day (or 20 to 25 work hours per week) and be able to change positions between sitting, standing, and walking as needed. The FCE report also set Koppert's lifting and carrying limit at 10 pounds to be performed occasionally.

82. In his December 22, 2014 second appeal, Koppert provided additional information about his job duties and the classification of his occupation. Prudential had previously classified Koppert's job with Lenovo as a sedentary position, discounting the information provided by both Koppert and his employer that describe an active, travel-heavy sales position. Koppert produced Dictionary of Occupation Titles and O*NET materials containing a more accurate description of Koppert's job duties—including the extensive travel demands and lifting requirements—and classifying the position as light duty.

83. While Koppert's second appeal was pending with Prudential's appeal unit, Koppert's attorney forwarded his Social Security Disability documentation. By letter dated January 12, 2015, Koppert's attorney provided Prudential with the Social Security Administration's disability determination explanation report and notice of award.

84. The Social Security Administration determined that Koppert was impaired by degenerative disc disease as of March 29, 2013. He was found to experience continuing increased low back pain despite physical therapy and pain-management medications. The Social Security Administration also concluded that there was no

evidence of a substance-abuse disorder by Koppert.

85.    On February 17, 2015, Prudential issued its final decision affirming the termination of Koppert's LTD benefits effective November 1, 2013.  The letter reiterated that Prudential terminated benefits when it determined that Koppert's medical information did not support impairment.  Prudential continued to rely on the lack of objective medical evidence in support of disability.  Prudential also acknowledged Koppert's award of Social Security Disability benefits, but asserted that different rules governing the respective programs may result in different eligibility determinations. Prudential did, however, acknowledge that Koppert's own occupation is best classified as light-duty employment in the field of technology sales.

86.    Koppert has exhausted his administrative remedies within the Prudential system.

87.    The LTD Plan does not contain a grant of discretionary authority to Prudential.  Therefore, Prudential's decision-making is not entitled to deference.

### Income and Disability Benefits Information

88.    For the pay period beginning March 16, 2013 and ending March 31, 2013 (i.e., 86.67 hours worked), Koppert earned a regular gross salary of $3,597.92.  This amount does not include his sales commissions.  Koppert's monthly gross pay as of the date of disability was $7,195.84.

89.    Beginning September 2013, Koppert received $2,097.60 gross per month in Social Security Disability benefits.

**COUNT I**

90.     Plaintiff restates and realleges the allegations in paragraphs 1 through 89 herein.

91.     Plaintiff is disabled under the terms of the LTD plan.

92.     Defendant Prudential's termination of LTD benefits violates ERISA.  29 U.S.C. § 1132(a)(1)(B), ERISA § 502(a)(1)(B).

93.     Koppert is entitled to the maximum LTD benefit of $4,796.75 ($7,195.84 x 0.6666), less any deductible sources of income.

94.     By reason of the foregoing, Plaintiff is entitled to judgment against Defendant for reinstatement in the LTD Plan, retroactive benefits dating back to September 30, 2013, and ongoing disability benefits, plus interest.

**COUNT II**

95.     Plaintiff restates and realleges the allegations in paragraphs 1 through 94 herein.

96.     Plaintiff has been forced to bring the instant action as a direct result of Defendant's violations.

97.     As a direct result of Defendant's acts and failures, Plaintiff has incurred attorneys' fees and costs.  Plaintiff is entitled to recover his attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g), ERISA § 502(g).

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Ronald Koppert requests that the Court:

1.     Adjudicate that Plaintiff meets the definition of disability under the Plan.

2.    Adjudicate that Defendant owes Plaintiff retroactive monthly benefits under the LTD Plan, plus interest.

3.    Enjoin Defendant to pay LTD benefits under the Plan, plus accrued interest.

4.    Award Plaintiff the costs, disbursements, and other expenses of this litigation, and reasonable attorneys' fees pursuant to 29 U.S.C. § 1132(g), ERISA § 502(g).

5.    Award such additional and further relief as the Court deems just and proper.

Respectfully submitted, this the 17th day of September, 2015.

/s/Norris A. Adams, II
NORRIS A. ADAMS, II
N.C. Bar No. 32552
**ESSEX RICHARDS, P.A.**
1701 South Boulevard
Charlotte, NC 28203-4727
Phone: (704)377-4300
Facsimile: (704)372-1357
NAdams@essexrichards.com

Denise Yegge Tataryn (MN #179127)*
Karen L. Helgeson (MN #0387796)*
**HELLMUTH & JOHNSON, PLLC**
8050 West 78th Street
Edina, Minnesota 55439
Phone: (952)941-4005
Facsimile: (952)941-2337
DTataryn@hjlawfirm.com
KHelgeson@hjlawfirm.com

*Attorneys for Plaintiff*

*Subject to admission *pro hac vice*